[Cite as *Szuch v. FirstEnergy Nuclear Operating Co.*, 2016-Ohio-620.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

| | |
|---|---|
| Michael Szuch and Holly Szuch | Court of Appeals No. OT-15-007 |
| Appellants | Trial Court No. 13CV396 |
| v. | |
| FirstEnergy Nuclear Operating Company, EPG2, LLC, and Erie Machine & Engineering, LLC | **DECISION AND JUDGMENT** |
| Appellees | Decided: February 19, 2016 |

* * * * *

Erik J. Wineland, for appellants.

Denise M. Hasbrook and Emily Ciecka Wilcheck, for appellee,
FirstEnergy Nuclear Operating Company.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellants, Michael and Holly Szuch, appeal the decision of the Ottawa

County Court of Common Pleas, denying their request for a permanent injunction against

appellee, FirstEnergy Nuclear Operating Company ("FENOC"). For the reasons that

follow, we affirm, in part, and reverse, in part.

## I. Facts and Procedural Background

**{¶ 2}** In November 2010, appellants purchased approximately 62 acres of property along Lake Erie in Ottawa County. Appellants do not reside on this property, but rather use it for enjoying nature and hunting deer and waterfowl. Adjacent to appellants' property on the east is Camp Perry, a National Guard training facility and the home of several national marksman tournaments. To the northwest of appellants' property is ARES, Inc., which develops and tests weapons ranging from small weapons (.50 caliber and below) to large arms (75 to 155 millimeter). Immediately to the west of appellants' property is the land leased by FENOC, on which it constructed a firing range for the purpose of training and qualifying, in accordance with federal regulations, the security force for its nuclear power plant.

**{¶ 3}** The shooting range, which became operational in December 2012, consists of three elements: (1) a 25-yard pistol range, oriented from the east to the west, (2) a 100-yard range, oriented from the south to the north, and (3) immediately to the east of the 100-yard range, a 200-yard range, also oriented from the south to the north. At the southern end of the 200-yard range is a 30-foot tower from which trainees shoot a .50 caliber weapon. The range was constructed with a 15-foot dirt backstop on the northern end, and 8-foot dirt side berms on the east and west edges of the range. Later, FENOC added a homemade 8-foot rubber bullet trap system to the front of the 15-foot backstop. The parties differ on whether the east edge of the range itself is 66 feet or 283 feet away from appellants' property line.

2.

{¶ 4} The range operates on a quarterly schedule. During the first quarter (November through January), the range is used one day per week between 12:00 p.m. and 8:00 p.m. In the second quarter (February through April), the range is used one day per week between 8:00 a.m. and 3:00 p.m. During the third and fourth quarters (May through October), the range is used two days per week between 7:00 a.m. and 5:00 p.m. The range is never used on the weekends. Notably, FENOC occasionally deviates from the schedule due to the need to train new hires or qualify persons returning from military or medical leave. In addition, the range is used by local law enforcement agencies approximately twice per year.

{¶ 5} On October 11, 2013, appellants filed a nuisance action against FENOC.[1] The complaint was subsequently amended twice to include claims of negligence, trespass, property damage, public nuisance, private nuisance, absolute nuisance, qualified nuisance, injunctive relief, punitive damages for intentional malice, and a claim that the statutory limit on punitive damages was unconstitutional as applied. The second amended complaint prayed for monetary damages as well as injunctive relief. Generally, appellants alleged that FENOC's construction of the firing range failed to meet the required safety regulations, and FENOC's operation of the firing range failed to comply with the required noise and hours regulations, thereby interfering with appellants' use and enjoyment of their property.

---

[1] The complaint also listed EPG2, LLC as a defendant. EPG2 owns the property that FENOC leased to build the firing range. The complaint was later amended to include Erie Machine & Engineering, LLC, as another defendant. EPG2 and Erie Machine & Engineering, LLC, are not parties to this appeal.

3.

{¶ 6} The matter proceeded to a four-day bench trial beginning on October 29, 2014, on appellants' claims seeking injunctive relief against FENOC.[2]  At the trial, numerous witnesses testified, including range safety experts and noise experts for both parties.

{¶ 7} Following the trial, the court entered judgment in favor of FENOC.  The trial court reasoned that FENOC was entitled to statutory immunity on both the noise and safety nuisance theories.  Further, the court found that even if FENOC was not immune, appellants failed to show that the range created a public or private nuisance.  Finally, the court found that there was no basis to grant injunctive relief because there was no reliable evidence showing that the range adversely affects any public or private interest, and there was evidence showing that it does serve a critical public interest by allowing FENOC to comply with mandatory training requirements for nuclear plant safety personnel.  Notably, at the end of its entry, the court concluded that "This decision is not intended to decide and should not affect any issue for the remaining damage claims which are properly triable by a jury."[3]

## II.  Assignments of Error

{¶ 8} Appellants have timely appealed the trial court's judgment, asserting six assignments of error for our review:

---

[2] The trial court bifurcated the injunction issues from the damage claims, stating that it "will schedule the damage issues trial after it concludes the injunction issues trial." Neither party has objected to or appealed from the trial court's bifurcation of the claims.

[3] Appellants have not ascribed any error to this statement, and neither party has discussed its potential impact in their appellate briefs.

4.

I. The trial court erroneously defined the "substantial compliance" standard resulting in the failure to enter a permanent injunction.

II. The trial court did not adhere to the plain language of the noise regulation, Ohio Adm. Code 1501:31-29-03(B)(1), resulting in the failure to enter a permanent injunction.

III. The trial court erred in determining FENOC was entitled to statutory immunity and failed to issue a permanent injunction based on the noise levels when the evidence presented at trial demonstrated that FENOC did not substantially comply with Ohio Adm. Code 1501:31-29-03(B)(1).

IV. The trial court erred in determining FENOC was entitled to statutory immunity and failed to issue a permanent injunction when the evidence presented at trial showed FENOC operated the shooting range outside the allowable hours in violation of Ohio Adm. Code 1501:31-29-03(C).

V. The trial court erred in determining FENOC was entitled to immunity from the injunction claim when the evidence demonstrated that FENOC did not substantially comply with the safety standards contained in Ohio Adm. Code 1501:31-29-03(D) and the NRA Range Source Book.

VI. The trial court erred in denying injunctive relief.

### III. Analysis

### A. Whether FENOC is Entitled to Statutory Immunity

{¶ 9} Applicable here, R.C. 1533.85(C) provides:

> Notwithstanding any contrary provision of law, the courts of common pleas, municipal courts, housing divisions of municipal courts, and county courts of this state shall not grant injunctive relief under Chapter 3767. or any other section of the Revised Code, under an ordinance, resolution, or regulation of a political subdivision, or under the common law of this state against the owner or operator of a shooting range in a nuisance action if the court determines that the owner's or operator's actions or omissions that are the subject of a complaint substantially complied with the chief's noise rules or the chief's public safety rules, whichever apply to the nuisance action.

Thus, the threshold issue before us is whether FENOC "substantially complied" with the applicable noise and safety rules,[4] and is therefore entitled to immunity.

{¶ 10} Statutory immunity is an affirmative defense. *State ex rel. Koren v. Grogan*, 68 Ohio St.3d 590, 594, 629 N.E.2d 446 (1994). "It is well settled in Ohio that the defendant asserting an affirmative defense has the burden of proof in establishing

---

[4] The parties do not dispute that the range operated by FENOC constitutes a "shooting range" as defined in the statute. R.C. 1533.83(B).

such defense." *MatchMaker Internatl., Inc. v. Long*, 100 Ohio App.3d 406, 408, 654 N.E.2d 161 (9th Dist.1995), citing *Dykeman v. Johnson*, 83 Ohio St. 126, 135, 93 N.E. 626 (1910).

{¶ 11} In reviewing the trial court's decision on immunity, we apply a de novo standard of review to the trial court's interpretation of the applicable noise and safety rules. *See State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, 871 N.E.2d 1167, ¶ 8 (interpretation of statutory authority is a question of law that is reviewed de novo). However, the trial court's determination of whether FENOC substantially complied with those rules is a question of fact, which will not be reversed unless it is based on insufficient evidence or is against the manifest weight of the evidence. *See Olen Corp. v. Franklin County Bd. of Elections*, 43 Ohio App.3d 189, 198, 541 N.E.2d 80 (10th Dist.1988) (trial court's determination of substantial compliance is generally a question of fact that will not be reversed if it is supported by competent, credible evidence).

### 1. "Substantial Compliance"

{¶ 12} In their first assignment of error, appellants argue that the trial court erred in defining "substantial compliance" for the purpose of determining whether FENOC was entitled to immunity from the claims for injunctive relief.

{¶ 13} "Substantial compliance" is not defined in the statute. In conducting its analysis, the trial court determined that "substantial compliance" "means that [FENOC] generally complies even if it occasionally fails to comply." Appellants argue that this

7.

standard is an incorrect statement of the law, which tainted the trial court's conclusion that FENOC "substantially complied" with the noise rules.  Appellants contend that substantial compliance requires more than general compliance, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 34, for the proposition that errors that are excusable under the substantial compliance standard are characterized as "minor procedural deviations" or "clearly de minimis."  FENOC, on the other hand, argues that the term "substantial compliance" is synonymous with the term "substantial performance," which is defined as, "[t]he rule that if a good-faith attempt to perform does not precisely meet the terms of an agreement or statutory requirements, the performance will still be considered complete if the essential purpose is accomplished."  *State v. Brooks*, 11th Dist. Lake No. 2011-L-049, 2013-Ohio-58, ¶ 31, quoting *Black's Law Dictionary* (10th Ed.2014).

{¶ 14} Upon review, we are not persuaded by appellants' argument.  Appellants seek to establish a continuum of compliance wherein "general compliance" is less onerous than "substantial compliance," which is less onerous than "strict compliance." We decline to do so.  The great weight of the case law suggests that "substantial compliance" is only used as an alternative to "strict compliance," thereby excusing minor, technical deviations from the standard.  *See e.g., Burnside* at ¶ 34; *State v. Francis*, 104 Ohio St.3d 490, 2004-Ohio-6894, 820 N.E.2d 355, ¶ 46-48 (applying substantial-compliance standard instead of a strict-compliance standard to recitation of immigration-related consequences of entering a plea as provided in R.C. 2943.031(A)).

8.

Indeed, we have found no cases attempting to draw a distinction between "compliance" and "substantial compliance." To the contrary, where a party has not substantially complied with a standard, that party is found to be not in compliance. *But see, State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 32 (requiring a reviewing court to look for partial compliance where a trial court does not substantially comply with Crim.R. 11 regarding non-constitutional rights for purposes of determining if a plea should be vacated without a showing of prejudice). This is so because the issue of substantial compliance is "whether the purpose of the statute has been served." *Olen Corp*, 43 Ohio App.3d at 198, 541 N.E.2d 80. Where the purpose of the statute has not been served, it follows that the party has not complied with the standard. Therefore, we hold that the trial court did not err when it articulated the substantial compliance standard as general compliance with occasional noncompliance, which is akin to minor or de minimis deviations.

{¶ 15} Accordingly, appellants' first assignment of error is not well-taken.

**2. Whether FENOC Substantially Complied with the Noise Rules**

{¶ 16} Appellants' second and third assignments of error are interrelated, thus we will address them together. In their second assignment of error, appellants argue that the trial court misinterpreted the applicable noise regulation, while in their third assignment of error, appellants argue that the trial court's finding that FENOC complied with the noise rules was not supported by the evidence.

9.

**{¶ 17}** R.C. 1533.84 requires that the chief of the division of wildlife adopt rules establishing generally accepted standards for shooting ranges. The statute specifies that "These rules shall be no more stringent than national rifle association standards, and include standards for the limitation and suppression of noise, standards for the hours of operation of shooting ranges of the various types and at the various locations of ranges, and standards for public safety." R.C. 1533.84. The applicable noise rules are found at Ohio Adm. Code 1501:31-29-03, which provides,

> (B) Private and public shooting ranges in Ohio should substantially comply with the listed noise or sound levels that are set to prevent hearing damage and eliminate nuisance noise complaints. Noise or sound level guidelines are described or explained in great detail in the (sic) "The NRA Range Source Book, Section I, Chapter six, (1999 Edition)." For the purpose of the chief of the division of wildlife's standards for shooting ranges, the following noise or sound levels apply:
>
> (1) Unacceptable: If the sound level exceeds ninety decibels dB(A) for one hour out of twenty-four hours or eighty-five decibels dB(A) for eight hours out of twenty-four hours and the sound measuring receiver is located at the boundaries of the range property.

**{¶ 18}** At issue between the parties is the question of what constitutes "one hour out of twenty-four hours." The trial court, in its decision, determined that the regulation "defines an unacceptable noise level as 90 dBA for the average noise level for one

continuous hour during a 24 hour period." Appellants disagree, and argue that the one hour standard is not one continuous hour. Thus, they contend that FENOC violated the standard when appellants' expert averaged the noise over 10-minute intervals and found more than six such intervals that exceeded ninety decibels in a 24-hour period. FENOC, on the other hand, agrees with the trial court that the noise must be averaged over a continuous one-hour period, and since its expert found that the maximum sound level at the range during any one-hour period was 77 decibels, it therefore was in compliance with the noise rules.

{¶ 19} The interpretation of an administrative regulation is subject to the same canons as statutory interpretation. *McFee v. Nursing Care Mgt. of Am., Inc.*, 126 Ohio St.3d 183, 2010-Ohio-2744, 931 N.E.2d 1069, ¶ 27. Where the language used in a regulation or statute is clear and unambiguous, the statute or regulation must be applied as written, and no further interpretation is necessary. *Vaughn Industries, Inc. v. Dimech Servs.*, 167 Ohio App.3d 634, 2006-Ohio-3381, 856 N.E.2d 312, ¶ 23 (6th Dist.), citing *Columbus & Franklin Cty. Metro. Park Dist. v. Shank*, 65 Ohio St.3d 86, 103, 600 N.E.2d 1042 (1992). If, however, the statute is subject to various interpretations, "a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent." *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 96, 573 N.E.2d 77 (1991).

{¶ 20} Here, we find Ohio Adm. Code 1501:31-29-03(B)(1) to be ambiguous as the "one hour out of twenty-four hours" language could be interpreted to mean one cumulative hour, or one consecutive hour.

{¶ 21} To resolve this ambiguity, we rely on the rule of statutory construction that "words in statutes should not be construed to be redundant, nor should any words be ignored." *E. Ohio Gas Co. v. Pub. Util. Comm.*, 39 Ohio St.3d 295, 299, 530 N.E.2d 875 (1988). "Statutory language 'must be construed as a whole and given such interpretation as will give effect to every word and clause in it. No part should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative.'" *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 26, quoting *State ex rel. Myers v. Bd. of Edn. of Rural School Dist. of Spencer Twp., Lucas Cty.*, 95 Ohio St. 367, 372-373, 116 N.E. 516 (1917).

{¶ 22} In applying this rule, we reject the trial court's interpretation that the statute requires one *continuous* hour of noise in excess of 90 dB(A). Such interpretation renders the phrase "out of twenty-four hours" meaningless as one continuous hour of excess noise will always violate the standard regardless of whether the reference period is 6 hours, 12 hours, 24 hours, or 48 hours. Similarly, less than one continuous hour of excess noise will never violate the standard regardless of the reference period. Therefore, to give effect to the phrase "out of twenty-four hours," we conclude that the regulation contemplates one *cumulative* hour of noise above 90 dB(A).

12.

{¶ 23} The question then becomes how to measure the sound such that individual periods can be added to determine whether the noise exceeds the threshold for one hour. Notably, neither the administrative rules nor the NRA Range Source Book provide any guidance on this issue. FENOC's sound expert offered two methodologies. The first was to record all of the sound over one hour, and then find the average decibel level for that hour. In so doing, FENOC's expert found that on April 23, 2014, the energy equivalent sound level (LAeq) was 77 dB(A) between 10:15 a.m. - 11:00 a.m., 42 dB(A) between 11:00 a.m. - 12:00 p.m., 74 dB(A) between 12:00 p.m. - 1:00 p.m., 76 dB(A) between 1:00 p.m. - 2:00 p.m., and 68 dB(A) between 2:00 p.m. - 3:00 p.m. However, the methodology of averaging the sound level over one-hour increments effectively results in requiring an average sound level above 90 dB(A) for one continuous hour, which we held is not the proper interpretation of the regulation. Furthermore, appellants' sound expert testified that averaging the sound level over one hour would "probably rarely, if ever," result in a reading above 90 dB(A) in a firing setting, rendering the regulation nugatory. Therefore, this methodology is not persuasive.

{¶ 24} Alternatively, FENOC's sound expert recorded the number of individual seconds throughout the day during which the noise from the range exceeded 90 dB(A). The expert reported that the range exceeded the 90 dB(A) threshold for 0.17 hours, or approximately 10 minutes. Averaged over the firing period, FENOC's range exceeded the 90 dB(A) threshold approximately once every 28 seconds. Because the sound when

13.

measured in one-second increments did not cumulatively exceed one hour, the expert concluded that FENOC substantially complied with the standard.

{¶ 25} We also find this methodology unpersuasive. This approach would lead to the absurd result that a shooting range would be in compliance with the noise rules even though it averaged one instance above 90 dB(A) every 15 seconds continuously during the day and evening hours from 7:00 a.m. - 10:00 p.m. Furthermore, similar to averaging the sound over a one-hour period, recording the sound in one-second increments would also lead to the practical reality that a shooting range could never violate the noise regulations.

{¶ 26} In contrast to FENOC's methodologies, appellants' sound expert recorded sound levels averaged over 10-minute intervals. During a three-hour period on January 14, 2014, appellants' expert recorded 14 such intervals (2 hours and 20 minutes) in which the energy equivalent sound level exceeded 90 dB(A).[5]

{¶ 27} However, we cannot subscribe to this methodology either. While the methodology is reasonable in that, under it, a shooting range may actually be able to violate the noise regulation, thus giving the regulation some utility, the selection of 10-minute intervals appears to be arbitrary. We are given no reason why the sound should

_____

[5] Appellants' expert recorded sound for two days in October 2013, and for several weeks in January 2014, yielding similar results. However, FENOC's expert criticized the data from those recordings, particularly the recordings from January 2014, because the ambient temperature was below the sound meter manufacturer's recommendations and because the wind speed was in excess of the recommended 12 mph. January 14, 2014, was a day in which the temperature and wind speed were within acceptable ranges. FENOC's expert also criticized appellants' expert's placement of the meter and failure to calibrate the meter during the testing period, among other things.

14.

not be averaged over 1-minute, 5-minute, 15-minute, or even 30-minute intervals. This is clearly an area of opportunity for the Chief of the Division of Wildlife to promulgate rules which would lend greater clarity to the standard, and the means by which the sound can be measured to test compliance with that standard. To that end, the NRA Range Source Book notes that some states, such as New Jersey, Illinois, and Connecticut, have very clear noise laws regarding impulse sounds.[6] *See also* Columbus Code of Ordinances 2329.11 (establishing maximum hourly average sound levels based on receiving land use categories, measured during a period of no less than "sixty (60) consecutive minutes").[7]

{¶ 28} Moreover, we do not feel compelled by necessity to embark upon an ill-advised and un-informed attempt at crafting an appropriate sound level measurement methodology to resolve the question of immunity. Here, FENOC has presented evidence limited to the one-continuous-hour equivalent sound level measurements and the cumulative one-second increments. Because we have determined that both of those methodologies are incongruous with a reasonable interpretation of the noise regulation, we hold that FENOC has failed to present any evidence supporting its affirmative defense

---

[6] For example, Connecticut prohibits impulse noise in excess of 80 dB peak sound pressure level during the night to any Class A Noise Zone, and 100 dB peak sound pressure level at any time to any Noise Zone. Regs. Conn. State Agencies 22a-69-3.2. For comparison, appellants' expert reported that FENOC's expert's measurements showed that the noise levels sometimes exceeded 115 dB(A).

[7] Columbus prohibits one hour average sound levels above 65 dB(A) during the daytime for residential properties, 75 dB(A) during the daytime for commercial properties, and 80 dB(A) at any time for manufacturing properties. The maximum one-hour average recorded by FENOC's expert on April 23, 2014, was 76 dB(A).

15.

of statutory immunity based on substantial compliance with that regulation. Therefore, the trial court's finding to the contrary is based on insufficient evidence.

{¶ 29} Accordingly, appellants' second and third assignments of error are well-taken.

### 3. Whether FENOC Substantially Complied with the Rules Concerning Hours of Operation

{¶ 30} As an initial matter in their fourth assignment of error, appellants argue that the Ohio Revised Code does not afford immunity to shooting ranges against claims based on the hours of operation. Furthermore, they contend that the regulation requires strict compliance, not substantial compliance. We disagree.

{¶ 31} As stated above, R.C. 1533.85(C) provides immunity from injunctive relief to shooting range operators if the shooting range "substantially complied with the chief's noise rules or the chief's public safety rules, whichever apply to the nuisance action." Importantly, R.C. 1533.83(D) defines "the chief's noise rules" as "the rules of the chief of the division of wildlife that are adopted pursuant to section 1533.84 of the Revised Code and that pertain to the limitation or suppression of noise at a shooting range *or to the hours of operation of shooting ranges*." (Emphasis added.) Thus, R.C. 1533.85(C) must be read as providing immunity if the shooting range "substantially complied with the [hours of operation of shooting ranges]."

{¶ 32} We will now turn to appellants' argument that the evidence did not support the trial court's finding that FENOC substantially complied with the hours of operation regulation. We note that, unlike the noise regulation, the regulation concerning hours of

16.

operation is simple and easily applied. Ohio Adm. Code 1501:31-29-03(C) provides, "The hours of operation for shooting ranges shall be from seven a.m. to ten p.m. daily, except for indoor or archery ranges."

{¶ 33} Appellants contend that FENOC violated this regulation on one day in August 2013. On that day, Michael Szuch heard gunfire coming from the range between 4:00 a.m. and 5:00 a.m. Szuch testified that he contacted Jose Vidal, who works in site protection as a security trainer for FENOC, about the shooting, and Vidal stated that they had to requalify some people for low light shooting. Regarding this incident, Vidal testified that they do not operate the range outside of the hours of 7:00 a.m. - 10:00 p.m., and that while he remembers a conversation about shooting early for low light qualification, he does not remember that the times 4:00 a.m. and 5:00 a.m. were discussed. Vidal stated that he could not believe that they shot before 7:00 a.m., but he does not remember what time they shot that morning. No investigation was conducted by FENOC to determine whether they shot outside of the permitted hours in August 2013. Nonetheless, Gregory Cramer, the manager of site protection, testified in an affidavit that "I am aware that the shooting range does not operate outside of the hours of operation set forth in Ohio Admin. Code 1501:31-29-03(C)."

{¶ 34} Concerning the issue of immunity for violation of the hours of operation rules, the trial court found, among other things, that "that single incident would not deny FENOC's immunity to sound injunction claims, even if it had been the source of that noise." We agree. Even assuming that FENOC did in fact fire between 4:00 a.m. and

17.

5:00 a.m. on one morning in August 2013, such solitary violation is de minimis. Therefore, we hold that the trial court's conclusion that FENOC is entitled to statutory immunity from appellants' nuisance claims based on the hours of operation is not based on insufficient evidence nor is it against the manifest weight of the evidence.

{¶ 35} Accordingly, appellants' fourth assignment of error is not well-taken.

### 4. Whether FENOC Substantially Complied with the Safety Rules

{¶ 36} In their fifth assignment of error, appellants argue that the trial court erred when it determined that FENOC was entitled to immunity based on its substantial compliance with the safety rules.

{¶ 37} Ohio Adm. Code 1501:31-29-03(D) provides,

> Private and public shooting ranges should substantially comply with safety guidelines generally recognized and accepted by the national rifle association (NRA). Suggested safety guidelines are described or explained in great detail in "The NRA Range Source Book, Section I, Chapter 2, (1999 Edition.)"

The administrative regulation also includes a requirement that a shooting range have an implemented safety plan that substantially includes approximately 20 different items in the categories of gun handling rules, general range rules, and specific range rules. Ohio Adm. Code 1501:31-29-03(D).

{¶ 38} In finding that FENOC substantially complied with the safety regulations, the trial court referenced the presence of trained instructors to monitor, supervise, and

18.

direct all firearms use, the presence of 15-foot backstops with rubber bullet entrapments, side berms, and the physical locking mechanism restricting the direction that the .50 caliber rifle can be aimed.  The court acknowledged appellants' concern that Holly Szuch heard a bullet whiz past her on their property, but commented that appellants have never found any bullets or bullet marks on their property.  The court also found that FENOC's expert was more reliable than appellants' expert, and accepted FENOC's expert's testimony that "its 15-foot backstops with rubber bullet entrapments, adequate side barriers, and rigorous supervision by trained instructors substantially comply with the NRA safety guidelines and the Wildlife Chief's regulations."

{¶ 39} Appellants argue that the trial court's findings were not supported by the evidence, citing several physical components that failed to meet the NRA's standards.[8]

{¶ 40} First, they note that the backstop at the range is only 15-feet high, but in the NRA Range Source Book, Section I, Chapter 1, Article 3.04.5.1(C), the suggested height is 20 feet.  According to FENOC's expert, the height of the backstop is important because "the lower back stops permit more frequently deflected bullet escapement."  The trial testimony indicates that the initial plans called for a 20-foot backstop, but the height was lowered to 15 feet after Robert Karr, FENOC's shooting range project manager, "Googled something saying range backstop height."  Notably, appellants point out that

---

[8] Appellants also cite FENOC's failure to utilize a "surface danger zone" and absence of a posted safety plan as additional reasons that FENOC does not substantially comply with the safety rules.  Because of our resolution based on the shooting range's physical characteristics, we need not reach those issues.

19.

the three FENOC employees responsible for the range construction project had no experience in shooting range design, and no consultant was hired.

{¶ 41} Appellants' range safety expert testified that the lower height was not substantially compliant with the applicable guidelines. In contrast, FENOC's expert, while acknowledging that he would recommend that the backstop height be increased to 20 feet, nonetheless testified that the backstop substantially complied because of the eight-foot homemade rubber bullet trap system. However, appellants contend that FENOC's expert's opinion is faulty because the 1999 edition of the NRA Range Source book that is cited in the regulation only recognizes rubber bullet trap systems for indoor ranges, and even then discourages range operators from building their own bullet trap systems.

{¶ 42} In addition to the height of the backstop, appellants cite the presence of rocks and debris on the face of the backstop and side berms as further non-compliance with the NRA guidelines. The NRA Range Source Book, Section I, Chapter 1, Articles 3.04.5.1(A) and 3.04.5.3(A) state that the surface area of the backstop and side berms must be free of rocks and debris to a depth of 18-24 inches and 12 inches, respectively.[9] Both experts agreed that the side berms and the backstop above the rubber bullet trap system contained rocks and gravel on their surface, although FENOC's expert contended that in various parts of the NRA Range Source Book only large rocks were prohibited.

_____

[9] Article 3.04.5.1(A) states surface areas must be "rock free soil." Article 3.04.5.3(A) states surface areas must be "rock and debris-free."

20.

The presence of rocks can lead to bullet deflections, which may result in bullets escaping from the range. Vidal confirmed that bullets have ricocheted at the range.

{¶ 43} Appellants also mention that the shooting range is not in compliance with regard to its use of range flags. The NRA Range Source Book, Section II, Chapter 2, Article 4.01.2 notes that range flags are used as a means of communicating with shooters and those who frequent the area. The flags indicate when the range is active. Vidal testified that FENOC leaves its flags up constantly. Appellants' expert also reported this, noting that the flag was left up even after he was given a safety brief and told that the range was clear and he was safe to go. Appellants' expert opined in his report that "[b]y constantly flying this flag, non-users may frequently see flag flying when range is inactive and be lulled into inattentiveness/disregard."

{¶ 44} In response, FENOC argues that there is no evidence that a single bullet has ever escaped the range. FENOC attacks Holly Szuch's testimony that she heard a bullet whiz past her as not credible because she never disclosed the incident to FENOC prior to the lawsuit, did not report it to her safety expert even though he was studying the issue of bullet containment, nor did she mention it at her deposition, instead waiting until the trial to bring it to light for the first time. Further, FENOC points out that it is the trial court's role to determine what testimony is credible and convincing, and in this case, the trial court found FENOC's expert to be more reliable. Thus, because FENOC's expert testified that the shooting range substantially complies with the NRA Range Source Book guidelines, the trial court's finding to that effect is supported by the evidence.

21.

{¶ 45} We disagree, and hold that the trial court's finding that FENOC substantially complied with the safety rules is against the manifest weight of the evidence. It is undisputed that the backstop at the range is five feet shorter than the guidelines recommend. Where the purpose of the backstop is to keep bullets contained within the range, a five-foot deviation is not clearly de minimis. Although FENOC's expert relies on the presence of the rubber bullet trap system to bring the range into compliance, such a system is not provided for in the controlling guidelines of the 1999 NRA Range Source Book. The height of the backstop, in addition to the presence of rocks in the face of the back stop and side berms and the improper use of the range flags, militates the conclusion that the shooting range does not substantially comply with the safety guidelines contained in the NRA Range Source Book.

{¶ 46} Accordingly, appellants' fifth assignment of error is well-taken.

### B. Whether Appellants' are Entitled to a Permanent Injunction

{¶ 47} Having determined that FENOC is not entitled to immunity on appellants' noise and safety nuisance theories, we now turn to appellants' final assignment of error, in which they argue that the trial court erred when it failed to grant a permanent injunction.

{¶ 48} "An injunction is an extraordinary remedy in equity where there is no adequate remedy available at law." *Garono v. State*, 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988). "The grant or denial of an injunction is solely within the trial court's

22.

discretion and, therefore, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion." *Id.*

{¶ 49} The party requesting a permanent injunction must prove the existence of a nuisance and demonstrate by clear and convincing evidence that (1) the plaintiff will suffer irreparable injury if the injunction is not granted, (2) the rights of third parties will not be unjustifiably harmed if the injunction is granted, and (3) the injunction will serve the public interest. *Novy v. Ferrera*, 11th Dist. Portage No. 2013-P-0063, 2014-Ohio-1776, ¶ 55; *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267, 747 N.E.2d 268 (1st Dist.2000).

{¶ 50} A nuisance is "the wrongful invasion of a legal right or interest." *Taylor v. Cincinnati*, 143 Ohio St. 426, 432, 55 N.E.2d 724 (1944). Nuisance may be designated as "public" or "private." A public nuisance is "an unreasonable interference with a right common to the general public." *Kramer v. Angel's Path, L.L.C.*, 174 Ohio App.3d 359, 2007-Ohio-7099, 882 N.E.2d 46, ¶ 15 (6th Dist.), quoting *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 712, 622 N.E.2d 1153 (4th Dist.1993). In contrast, a "private" nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Kramer* at ¶ 17. Nuisance may be further divided into "absolute" and "qualified." "An absolute nuisance, or nuisance per se, is based on intentional conduct or an abnormally dangerous condition that cannot be maintained without injury to property, no matter what precautions are taken." *Id.* at ¶ 19. A

23.

"qualified" nuisance, on the other hand, "is a lawful act 'so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another." *Id.* at ¶ 21, quoting *Metzger v. Pennsylvania, Ohio & Detroit RR. Co.*, 146 Ohio St. 406, 66 N.E.2d 203 (1946), paragraph two of the syllabus. "For there to be an action for nuisance, the injury must be real, material, and substantial." *Banford v. Aldrich Chem. Co., Inc.*, 126 Ohio St.3d 210, 2010-Ohio-2470, 932 N.E.2d 313, ¶ 17. "Damages for nuisance may include diminution in the value of the property, costs of repairs, loss of use of the property, and compensation for annoyance, discomfort, and inconvenience." *Id.*

### 1. Whether Appellants Have Proven the Existence of a Nuisance Based on Noise Emanating from the Range

{¶ 51} In determining that a noise nuisance did not exist, the trial court examined the surrounding conditions, such as the fact that there are no nearby residences and that other shooting activities affect appellants' property, including Camp Perry, the Toussaint Hunt Club, which it found was within "projectile and/or sound range" of appellants' property, and ARES, Inc. In addition, the court found that appellants failed to support their claim that FENOC's shooting range frightens away deer or waterfowl. Finally, the court found that there was no reliable evidence that the FENOC range adversely affects any public interest, or that it unreasonably impairs appellants' expected use for their property.

**{¶ 52}** Appellants, while commingling their noise and safety nuisance claims in their assignment of error, argue that the evidence demonstrates both a public and private, absolute and qualified nuisance. Relative to the public nuisance theories, we hold that the trial court's decision is not against the manifest weight of the evidence as there was no testimony that other properties, individuals, or the general public were impacted by the noise from the range.

**{¶ 53}** Turning to the private nuisance theories, appellants contend that FENOC's violation of the noise regulations constitutes a nuisance per se. *See Metzger*, 146 Ohio St. 406, 66 N.E.2d 203, at paragraph one of the syllabus (a nuisance per se consists of "an act involving culpable and unlawful conduct causing unintentional harm"). FENOC disagrees, arguing that the noise regulations are not required "safety statutes," but instead are merely criteria for determining whether a shooting range is entitled to immunity. We concur with FENOC's position. Violation of the noise regulations strips the shooting range of its immunity from nuisance claims, but it does not categorically mean that the shooting range is unlawful. Thus, we find appellants' contention that the FENOC shooting range constitutes a private, absolute nuisance to be without merit.

**{¶ 54}** Alternatively, appellants argue that the operation of the range above the noise regulations is evidence of negligence sufficient to establish a qualified nuisance. We agree, and hold that the trial court's finding that the shooting range does not unreasonably impair appellants' expected use for their property is against the manifest weight of the evidence. Although the trial court references appellants' failure to prove

that the shooting activities have scared away deer or waterfowl available for hunting, the court's decision does not consider the testimony from both land appraisal experts that the presence of a gun range adjacent to a property has a negative influence on that property's value. Further, appellants' land appraisal expert testified that hunting and recreation is no longer the best and highest use of the land, and that its best use would be limited to a "buffer zone" because of its proximity to the shooting range and the severe deed restrictions on the land, which provide:

> The Property shall be used for hunting purposes (including bow hunting and gun hunting) and the storage of commercial equipment and fishing nets owned by Grantee only ("Permitted Uses"). Under no circumstances shall any industrial activities or manufacturing occur on the Property. Without the consent of the Grantor, which consent may be without in its sole discretion, no portion of the Property shall contain wind turbines, solar panels or similar energy producing devices. No portion of the Property or any building therein shall be used or permitted to be used for any purpose (other than Permitted Uses) which may endanger the health of the neighborhood.

FENOC's expert testified that the best and highest use for the land was, and has always been, conservation, not hunting and fishing, but that the land is unlikely to be suitable for a park because of the gun ranges around it, and "people would not be inclined to go to an area where there is potential gun fire." Finally, there was testimony from several of the

26.

experts who visited the range that the noise was so loud that it could be felt on appellants' property. Therefore, we hold that the trial court erred in not finding a private, qualified nuisance based on the noise from FENOC's range.

### 2. Whether Appellants Have Demonstrated a Nuisance Based on Bullets Escaping the Range

{¶ 55} As with their noise nuisance theories, appellants argue that the safety conditions at the shooting range constitute both a public and private, absolute and qualified nuisance because they result in bullets escaping the range. To support their position, appellants rely on Vidal's testimony that ricochets occur at the range, and Holly Szuch's testimony that she has heard bullets travelling past her while she was on her property. The trial court, however, found appellants' claims of bullet escapement to be unwarranted. In its discussion of immunity on the safety conditions, the trial court noted that there is no direct evidence that any of the more than 300,000 bullets fired have ever escaped FENOC's shooting range, as no bullets or bullet marks were ever found on appellants' property. While we recognize the practical difficulty of finding evidence of bullet escapement on appellants' 62-acre property, we nevertheless cannot hold that the trial court's decision is against the manifest weight of the evidence. *Compare Battelle Mem. Inst. v. Big Darby Creek Shooting Range*, 192 Ohio App.3d 287, 2011-Ohio-793, 948 N.E.2d 1019 (12th Dist.) (employees heard whistling of bullets, eight bullet impact areas were found on a building, and a car and air conditioning unit were found to have been struck by bullets).

27.

### 3. Whether the Trial Court Abused Its Discretion in
### Denying the Request for an Injunction

{¶ 56} Finally, having held that the noise from FENOC's shooting range constitutes a private, qualified nuisance, we turn to the question of whether the trial court abused its discretion in denying the injunction. To be entitled to an injunction, appellants must demonstrate by clear and convincing evidence that (1) the plaintiff will suffer irreparable injury if the injunction is not granted, (2) the rights of third parties will not be unjustifiably harmed if the injunction is granted, and (3) the injunction will serve the public interest. *Novy*, 11th Dist. Portage No. 2013-P-0063, 2014-Ohio-1776, at ¶ 55. Here, the court found that there is no reliable evidence demonstrating that the shooting range affects any public interest, but that the range does serve a critical public interest by complying with the mandatory training requirements for nuclear plant safety personnel.

{¶ 57} In arguing that the court abused its discretion, appellants cite the diminution of property value as the irreparable harm sufficient to grant an injunction.[10] Appellants next argue that an injunction will not harm third parties because FENOC could use, and has used in the past, other shooting ranges to qualify its security personnel. Further, appellants contend that an injunction would serve the public interest because it would ensure that shooting ranges abide by NRA guidelines, which have as their goal the development of good relationships between range operators and the neighboring property owners and community at large.

---

[10] Appellants also cite their fear of using the property because of the potential for bullet escapement. However, that justification is applicable only to the safety nuisance claim, not the noise nuisance claim.

28.

**{¶ 58}** Notwithstanding appellants' arguments, we hold that the trial court did not abuse its discretion in denying the injunction. First, we note that the diminution of property value is remediable in law through damages that may be proven and compensated for in money. *Antonik v. Chamberlain*, 81 Ohio App. 465, 479, 78 N.E.2d 752 (9th Dist.1947). Thus, that injury is not irreparable. Furthermore, the harm is mitigated by the fact that appellants do not reside on the property, only using it for recreation (and the occasional storage of fishing equipment) instead, and FENOC only fires once or twice during the week, and never on the weekends. Finally, we cannot disagree with the trial court that the continued operation of the shooting range is in the public's interest as it provides the required training for security officers at a nuclear power plant.

**{¶ 59}** Accordingly, appellants' sixth assignment of error is not well-taken.

### III. Conclusion

**{¶ 60}** For the foregoing reasons, the judgment of the Ottawa County Court of Common Pleas is affirmed, in part, and reversed, in part. The portions of the judgment finding that FENOC is entitled to statutory immunity from appellant's noise and safety nuisance claims, and that appellants have not proven a noise nuisance are reversed. The rest of the trial court's judgment is affirmed. The matter is remanded to the trial court for further proceedings on appellants' claims for damages. Pursuant to App.R. 24(A)(4), costs of this appeal are to be shared evenly by the parties.

Judgment affirmed, in part
and reversed, in part.

29.

OT-15-007
Szuch v. Firstenergy
Nuclear Operating
Company, EPG2, LLC,
and Erie Machine &
Engineering, LLC

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

_____
JUDGE

Arlene Singer, J. _____

_____
JUDGE

James D. Jensen, P.J. _____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.