[Cite as *Waldock v. Rover Pipeline, L.L.C.*, 2020-Ohio-3307.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Thomas Waldock, Trustee of the Trust
Agreement of Thomas A. Waldock, et al.

Court of Appeals No. WD-19-048

Appellants

Trial Court No. 2017-CV-0256

v.

Rover Pipeline, LLC, et al.

**DECISION AND JUDGMENT**

Appellees

Decided: June 12, 2020

* * * * *

Zachary J. Murry, for appellants.

Gregory D. Brunton, Daniel J. Hyzak, Bruce A. Moore and
Thomas Zabel, for appellee Rover Pipeline, LLC.

Sheila A. McKeon and Richard C. O. Rezie, for appellee Precision
Pipeline Construction Company.

* * * * *

**MAYLE, J.**

{¶ 1} Plaintiffs-appellants in this matter are Thomas Waldock, Trustee of the Trust

Agreement of Thomas A. Waldock; Kenneth Stearns and Jane M. Stearns, Trustees of the

Stearns Family Trust; Valeria V. Nye; Patty J. Stearns, Successor Trustee of the Jack L.

Stearns Declaration of Trust; Michael J. Stearns, Trustee, under the Trust Agreement of Michael J. Stearns; and Barbara Ann Turley ("appellants"). They appeal the June 5, 2019 judgment of the Wood County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Rover Pipeline, LLC ("Rover") and Precision Pipeline Construction Company ("Precision"), and denying their cross-motion for partial summary judgment. For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} Appellants own approximately 3,300 acres of farmland in Wood County, Ohio. Rover is constructing an interstate natural gas pipeline that stretches from Pennsylvania and West Virginia, across the northern half of Ohio, and into Michigan, requiring access over appellants' property. Precision is one of its contractors.

{¶ 3} On February 6, 2017, after obtaining a certificate of public convenience and necessity from the Federal Energy Regulatory Commission ("FERC") ("the FERC certificate")—as is required to construct an interstate natural gas pipeline—Rover initiated condemnation proceedings under the Natural Gas Act ("NGA"), 15 U.S.C. § 717, et seq. in the U.S. District Court for the Northern District of Ohio against numerous property owners, including appellants. *Rover Pipeline, LLC v. Rohrs, et al.*, N.D.Ohio No. 3:17-cv-00225-JGC. It sought 60-foot wide permanent pipeline easements, temporary workspace easements, surface site easements, and permanent and temporary road access easements across appellants' properties. On March 8, 2017, Rover reached an agreement with appellants whereby they granted Rover immediate possession

2.

of 60-foot wide non-exclusive permanent easements across their properties and 100-foot wide temporary construction easements on some of the land. The issue of the compensation to be paid to appellants was reserved.

{¶ 4} Upon reaching this agreement with appellants, Rover began construction.[1] In the first two months of construction, the area received substantial rainfall. The rain caused storm and groundwater build-up in Rover's easement and dig sites. According to appellants, in addition to this naturally-occurring water, Rover's directional boring operations also caused the build-up of water and various chemicals.

{¶ 5} Appellants maintain that when confronted with this excess water, Rover could have waited for the ground to dry, or it could have dewatered the easement area by pumping water into trucks and hauling it away. Instead, they claim, Rover chose to dewater the easement areas by pumping water and other liquid out of the easements and onto appellants' properties, causing significant flooding and contaminating the land. Appellants contend that in doing so, Rover placed hoses and other equipment on land outside the easements, and in one instance, even pumped water, sediment, and other debris directly into one of the landowner's field tile drainage system.

{¶ 6} On May 5, 2017, appellants sued Rover and Precision in the Wood County Court of Common Pleas, alleging eight causes of action: (1) trespass; (2) nuisance; (3) negligence and hazardous waste; (4) tortious interference with business;

---

[1] Both Rover and Precision are parties to this action. They filed separate briefs, but their positions are consistent. For ease of discussion, we refer to them collectively as "Rover."

3.

(5) declaratory judgment; (6) injunction; (7) abuse of power and authority and bad faith; and (8) punitive damages. Appellants claimed that Rover's dewatering activities washed out valuable field crops that had already been planted and prevented further farming operations until the ground is dry enough, rendering it unlikely that the property would be farmable in 2017. They also claimed that horizontal drilling lubricants and other materials have contaminated their land.

{¶ 7} Rover filed a notice of removal in the U.S. District Court for the Northern District of Ohio. *Waldock v. Rover Pipeline LLC*, N.D.Ohio No. 3:17CV959, 2017 WL 3224573, *1 (July 31, 2017). It argued that the district court had federal-question jurisdiction over appellants' claims because they arose under the NGA. Appellants responded that their claims arose under state law and that Rover was merely asserting a federal defense, which is not grounds for removal. The federal court agreed with appellants. Applying the well-pleaded complaint rule, it held that appellants' claims—as framed in their complaint—did not arise under federal law and there was no federal question jurisdiction. It remanded the matter to state court. The case was reinstated to the docket of the Wood County Court of Common Pleas on August 10, 2017.

{¶ 8} On December 26, 2018, Rover moved for judgment on the pleadings or, alternatively, summary judgment. It argued that appellants' claims are expressly preempted by the plain language of Rover's FERC certificate and the NGA; Rover had an express federal privilege to dewater its pipeline trench onto appellants' property;

4.

appellants' damages claims are already being litigated in federal court; and appellants' lawsuit is, in fact, one for inverse condemnation, which may be alleged only in a mandamus action.

{¶ 9} Appellants opposed Rover's motion. They argued that their claims arose from Rover's misconduct *off* the right-of-way, thus their claims are not preempted; they maintained that their claims are distinct from the issues pending in federal court; and they denied that their claims are for inverse condemnation. They also sought summary judgment on their claims for trespass, nuisance, negligence, and tortious interference with business.

{¶ 10} The trial court granted summary judgment in favor of Rover and denied appellants' cross-motion. It concluded that there was a conflict between appellants' state law claims and Rover's privilege under the FERC certificate and other related documents, thus appellants' claims were preempted by the NGA. The court further concluded that Rover abided by the terms of those documents, which authorized it to dewater trenches "either on or off the construction right of way." It acknowledged that appellants may be entitled to compensation for damage to their land and crops, but it held that any claim for such damages must be presented "at the federal level."

{¶ 11} Appellants appealed and assign the following errors for our review:

1. The Trial Court committed reversible error by entering summary judgment in favor of the Defendants-Appellees.

5.

2. The Trial Court committed reversible error by denying Plaintiffs' Cross-Motion for Partial Summary Judgment where the undisputed facts of the case show that Defendants-Appellees trespassed upon Plaintiffs-Appellants' land.

## II. Legal Standard

{¶ 12} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

*Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 13} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293,

6.

662 N.E.2d 264 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III. Law and Analysis

{¶ 14} Appellants claim error in the trial court's decision granting summary judgment in favor of Rover and denying their cross-motion for partial summary judgment. Before addressing the parties' legal arguments, we briefly explain the procedures set forth under the NGA for obtaining approval to construct a natural gas pipeline, and we summarize the details pertinent to Rover's efforts to obtain the FERC certificate at issue here.

### A. An entity proposing to build a pipeline must obtain a FERC certificate.

{¶ 15} Congress created FERC in 1977. *Grdn. Pipeline, L.L.C. v. 529.42 Acres of Land*, 210 F.Supp.2d 971, 973 (N.D.Ill.2002), citing 42 U.S.C. 7171(a). Among other things, FERC is tasked with determining the public necessity for the development of natural gas pipelines. *Id.*, citing 42 U.S.C. 7172(a)(1)(D). "An entity proposing to

7.

construct such a pipeline must obtain a certificate of public convenience and necessity from FERC (FERC Certificate)." *Id.*, citing 15 U.S.C. 717f(c).

{¶ 16} The NGA specifies the procedure for obtaining a FERC certificate. 15 U.S.C. 717 et seq. The process begins with an application from the gas company (1) describing the proposed pipeline project, (2) explaining why the project is required, and (3) estimating the beginning date and completion date for the project. *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, 818 (4th Cir.2004), citing 15 U.S.C. 717f(d); 18 C.F.R. 157.6(b). Notice of the application is filed in the Federal Register, a period of public comment and protest is allowed, and FERC conducts public hearings on the application. *Id.*, citing 18 C.F.R. 157.9-11. In evaluating an application, FERC must investigate "the environmental consequences of the proposed project and issue an environmental impact statement." *Id.*, citing 42 U.S.C. 4332.

{¶ 17} If after completing this process FERC finds that the proposed project "is or will be required by the present or future public convenience and necessity," it will issue the certificate. *Id.*, citing 15 U.S.C. 717f(e). "The certificate may include any terms and conditions that FERC deems 'required by the public convenience and necessity.'" *Id.*, citing 18 C.F.R. 157.20. A person or entity seeking review of the FERC order may do so "by way of petition to the court of appeals where the proposed pipeline is located or the holder of the FERC Certificate has its principal place of business or to the Court of Appeals for the District of Columbia." *Grdn. Pipeline, L.L.C.* at 973, citing 15 U.S.C. 717r.

8.

{¶ 18} Once FERC has issued a certificate, the certificate holder is empowered to exercise "the right of eminent domain" over any lands needed for the project. 15 U.S.C. 717f(h). The condemnation rules are provided in Fed.R.Civ.P. 71.1.

### B. Rover obtained a FERC certificate and a Final Environmental Impact Statement ("FEIS") was issued.

{¶ 19} On June 26, 2014, Rover filed a request with FERC to initiate the agency's pre-filing process for the pipeline. On June 27, 2014, FERC granted the request and assigned a pre-filing docket number to place information relating to the project into the public record. FERC and other cooperating agencies began environmental reviews of the project.

{¶ 20} On November 14, 2014, FERC issued a notice of intent to prepare an environmental impact statement ("EIS") and request for comment, which it published in the Federal Register on November 18, 2014, and mailed to more than 15,600 interested parties. The dates and locations for ten public meetings were announced, and a comment deadline was set for December 18, 2014.

{¶ 21} Rover filed its application for a FERC certificate on February 23, 2015. Its application was published in the Federal Register on March 16, 2015. FERC issued a draft EIS on February 19, 2016, which it published in the Federal Register, mailed to its environmental mailing list, and filed with the Environmental Protection Agency. Public hearings were held and a comment period was established, ending on April 11, 2016.

FERC received over 2,000 comments from landowners and other citizens, agencies, and organizations who expressed a variety of environmental concerns.

{¶ 22} FERC evaluated these concerns, along with Rover's proposed impact avoidance, minimization, and mitigation measures. FERC acknowledged that approval of the project would have some "adverse and significant environmental impacts," but it concluded that "these impacts would be reduced to acceptable levels with the implementation of Rover's * * * proposed mitigation and the additional measures recommended by staff in the final EIS," which it issued in July of 2016. Among the concerns recognized in the FEIS was the potential effect on soil and agricultural land, the potential for leaks of hazardous materials, the potential for reduced crop yields and productivity, and effects on drainage patterns and systems. Certain provisions in the FEIS, along with Rover's Agricultural Impact Mitigation Plan ("AIMP") and Project Specific Upland Erosion Control, Revegetation and Maintenance Plan ("UEC Plan"), were designed to address these concerns.

### C. The FEIS, AIMP, and UEC Plan anticipate the need for dewatering and potential damage to farmland.

{¶ 23} Among other things, the FEIS, AIMP, and UEC Plan explicitly anticipate that excess water may accumulate in the pipeline trenches and that Rover may need to dewater the trenches, potentially damaging crops and farmland off the right-of-way. These documents provide dewatering procedures intended to avoid or mitigate such damage. The FEIS provides at 2-25:

When trench dewatering is needed, water would be discharged off the right-of-way into a well-vegetated upland area and/or into an approved filter.

This is reiterated at 4-65:

When feasible, water from the trench would be dewatered to a well-vegetated upland location. All dewatering activities would be done using energy-dissipation/filtration devices in a manner that would not cause erosion or silt-laden waters to enter nearby sensitive features (e.g., waterbodies). The applicants would also monitor dewatering activities to ensure deposition of sand, silt, and/or sediment into sensitive features is not occurring. If deposition does occur, the applicants would stop dewatering activities and make adjustments to prevent recurrence. Dewatering structures would be removed as soon as practicable following dewatering activities.

And again at 4-90:

During construction, the open trench may accumulate water, either from the seepage of groundwater or from precipitation. Where necessary, Rover would dewater the trench in a manner that would not result in silt-laden water entering waterbodies or wetlands and would not cause erosion, as described in Rover's procedures. This process would prevent heavily silt-laden water from flowing into any adjacent waterbodies or wetlands.

11.

{¶ 24} The AIMP also addresses the potential that dewatering will be necessary. Appendix G-3, section 19(A), entitled Pumping of Water from Open Trenches, provides:

> In the event it becomes necessary to pump water from open trenches, Rover will pump the water in a manner that will avoid damaging adjacent agricultural land, crops, and/or pasture. Such damages include, but are not limited to, inundation of crops for more than 24 hours, deposition of sediment in ditches and other water courses, and the deposition of subsoil sediment and gravel in fields and pastures.

Finally, the UEC Plan recognizes the potential need to dewater. It provides at section IV(A)(1):

> Project-related ground disturbance shall be limited to the construction right-of-way, extra work space areas, pipe storage yards, borrow and disposal areas, access roads, and other areas approved in the FERC's Orders. Any project-related ground disturbing activities outside these areas will require prior Director approval. This requirement *does not apply* to activities needed to comply with the Plan and Procedures (i.e., slope breakers, energy-dissipating devices, *dewatering structures*, drain tile system repairs) or mild field realignments and workspace shifts per landowner needs and requirements that do not affect other landowners or sensitive environmental resource areas. All construction or restoration activities outside of authorized areas are subject to all applicable survey and

12.

permit requirements, and landowner easement agreements. (Emphasis added.)

{¶ 25} While these documents identify dewatering procedures intended to avoid or minimize damage to surrounding land and crops, there is an express acknowledgment within these provisions that damage may nonetheless occur. The FEIS and AIMP make clear that Rover must compensate landowners for damages to their land and crops, whether such damage occurs on or off the right-of-way. The FEIS provides at 4-51:

> Rover would compensate landowners for damages caused on or off the right-of-way by construction activities. Rover would mitigate for impacts on agricultural lands by use of the following measures: * * * landowner compensation for lost production and/or crop damages * * *.

It also provides at 4-176:

> Pumping of water from the trenches would be done in a manner to minimize or avoid damaging adjacent agricultural lands and crops. If damages cannot be avoided, the landowner would be compensated.

> Landowners would be compensated for any construction-related damages caused by Rover on or off the construction work area. * * * If crops were damaged during this time, the landowner would be compensated for the damaged crops.

13.

{¶ 26} The AIMP provides similarly. It states at Appendix G3-13, section 13(A):

> Rover will compensate Landowners for construction-related damages caused by Rover that occur on or off of the established pipeline right-of-way.

This is reiterated at Appendix G3-15, section 19(B):

> If it is impossible to avoid water-related damages as described in item 19.A, above, Rover will compensate the Landowners for the damages or will correct the damages so as to restore the land, crops, pasture, water courses, etc. to their pre-construction condition.

### D. State laws may be impliedly preempted by federal statutes or regulations.

{¶ 27} The trial court held that appellants' state-law claims are preempted because they conflict with Rover's "federal privilege under the FERC Certificate, FEIS, and associated documents." It reasoned that "to allow [appellants'] state law claims to go forward would be to place state law above federal privilege."

{¶ 28} The Supremacy Clause of the U.S. Constitution "grants Congress the power to preempt state laws." *Talik v. Fed. Marine Terminals, Inc.*, 117 Ohio St.3d 496, 2008-Ohio-937, 885 N.E.2d 204, ¶ 20. It provides that "the Laws of the United States * * * shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Article VI, cl. 2, U.S. Constitution.

{¶ 29} Preemption can occur in one of three ways: (1) express preemption, (2) preemption of the field, and (3) preemption due to conflict. *Talik* at ¶ 21. "Express

14.

preemption occurs when Congress declares outright that an enactment preempts state law." *Id.* Field preemption occurs when Congress enacts a scheme of federal regulations that is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." (Internal quotations and citations omitted.) *Id.* Finally, conflict preemption occurs "when the state law actually conflicts with federal law." *Id.* at ¶ 23. Preemption due to conflict exists when it is impossible to comply with both state and federal requirements or where state law poses an obstacle to accomplishing congressional objectives. *Id.*

### E. Appellants claim that no conflict exists here.

{¶ 30} Appellants argue that their claims are not preempted because Rover failed to comply with the terms of the FERC certificate and the FEIS. They maintain that these documents required Rover to obtain a variance before expanding its workspace beyond the designated easement, and it failed to do so. In support of their claim that Rover was required to obtain a variance, appellants point to Environmental Condition number five in the FERC certificate:

> Each applicant shall file detailed alignment maps/sheets and aerial
>
> photographs at s scale not smaller than 1:6,000 identifying all route
>
> realignments or facility relocations, and staging areas, contractor yards,
>
> new access roads, and other areas that would be used or disturbed and have

15.

not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested. * * * Each area must be approved in writing by the Director of OEP before construction in or near that area. (Certificate at 112.)

They also point to the following provisions of the FEIS, which they claim require a variance for acquiring additional workspace:

Extra Workspace

In addition to the various construction right-of-way configurations described in section 2.2.1.2, Rover has requested a wider right-of-way in several locations due to the presence of constraints mentioned above and for other site-specific, construction-related reasons. Appendix E identifies where Rover has requested extra workspace for staging areas and resource crossings, and includes workspace dimensions, the acreage of impact, associated land use, and Rover's justification for their use. * * *

Additional extra workspaces beyond those currently identified could be required during construction of the Projects. Prior to construction, the applicants would be required to file a complete and updated list of all extra work areas (including contractor yards) for review and approval (see Post-Approval Variance Process in section 2.5.4).

(FEIS at 2-18).

16.

Post-Approval Variance Process

The pipeline alignment work areas identified in the EIS should be sufficient for construction and operation (including maintenance) of the Projects.  However, minor route alignments and other workspace refinements sometimes continue past the Project planning phase and into the construction phase.  These changes could involve minor route alignments, shifting or adding new extra workspaces or staging areas, adding additional access roads, or modifications to construction methods.  We have developed a procedure for assessing impacts on those areas that have not been evaluated in this draft EIS and for approving or denying their use following any Certificate issuance.  In general, biological and cultural resource surveys were conducted using a survey corridor larger than that necessary to construct the facilities.  Where survey approvals were denied, Rover would complete the required surveys following a Certificate issuance.  If the applicants request to shift an existing workspace or require a new extra workspace subsequent to issuance of a Certificate, these areas would typically be within the previously surveyed area.  Such requests would be reviewed using a variance process.

A variance request for route realignments or extra workspace locations, along with a copy of the survey results, would be documented and submitted to either the onsite compliance monitors or to the FERC in

the form of a "variance request" in compliance with recommended condition number 5 in section 5.2 of this EIS. Minor variance requests, such as new workspace within the previously surveyed corridor that would not require tree clearing or impacts on sensitive resources, would be reviewed by the compliance monitor and could be approved in the field if deemed necessary and acceptable. For larger or more complex variance requests, the FERC would take the lead on reviewing and making a final determination on the request. Typically, no further resource agency consultation would be required if the requested change is within previously surveyed areas and no sensitive environmental resources are affected.

The procedures used for assessing impacts on work areas outside the survey corridor and for approving their use are similar to those described above, expect that additional surveys, analyses, and resource agency consultations would be performed to assess the extent of any impacts on biological, cultural, and other sensitive resources and to identify any avoidance or minimization measures necessary. All variance requests for the Projects and their approval status would be documented according to the FERC's compliance monitoring program as described above. Any variance activity by any of the applicants (whether submitted through the third-party compliance monitoring program or directly to the FERC) and

subsequent FERC action would be available on the FERC's e-library webpage * * *.

After the applicants complete any additional surveys, landowner consultation, analyses, and/or resource agency consultations, the new work area and supporting documentation (including a statement of the landowner approval) would be submitted to the FERC in the form of a formal variance request, which would be evaluated in the manner described above for approval or denial.

(FEIS at 2-38).

{¶ 31} Appellants maintain that the trial court judgment was "premised upon the erroneous conclusion that Rover adhered to its agreements with FERC," when, in fact, it did not. They insist that only the areas that were appropriated were subject to the FERC certificate—areas outside the FERC certificate are outside FERC's purview because Rover did not first seek a variance to acquire that additional property. They argue that the FERC certificate and the FEIS "have no connection to Rover's conduct off its right-of-way," therefore, "there can be no conflict between Ohio and federal law."

{¶ 32} Appellants also argue that the flooding here was not a necessary, natural, and proximate result of Rover's take; rather Rover made the affirmative decision to pump water onto appellants' property instead of hauling it away or pumping it into the county's drainage system. They claim that the conduct here was a product of Rover's desire to remove the water as cheaply and expeditiously as possible, "even if that meant trampling

19.

on [appellants'] property rights." They maintain that there is nothing in the NGA that gives Rover the right to trespass off the right-of-way, and there is no conflict between the FERC certificate and their state law claims that would make it impossible to have constructed its pipeline exclusively within the easements it obtained.

{¶ 33} Finally, appellants argue that the statements in the FERC certificate and FEIS indicating that Rover must compensate them for damages caused by dewatering are "mere acknowledgements of Rover's existing obligations under state law." They claim that this lawsuit is "the exact means by which [to] seek to have Rover compensate them for its tortious conduct * * *."

{¶ 34} Rover responds that it was not required to obtain a variance before dewatering because the FERC certificate "clearly, expressly and repeatedly" confirms its right to dewater its pipeline trench off the easement area and onto adjacent properties and crops. It maintains that appellants cite nothing to suggest that a variance was required under the circumstances here and that it would be illogical to expect it to obtain variances—a prolonged procedure—to address changing weather conditions. Rover insists that even if it was required to obtain a variance, thereby failing to comply with its duties under the NGA, this would still be an issue within the sole and exclusive jurisdiction of the federal courts.

{¶ 35} Rover also argues that there is an irreconcilable conflict between its federal right to dewater its trenches and state laws addressing such claims as trespass

20.

and nuisance.  It points out that the main case cited by appellants holding otherwise—

*Humphries  v. Williams Natural Gas Co.*, 48 F.Supp.2d 1276 (D.Kan.1999)—did so

because the alleged torts occurred *before* the gas company obtained a FERC certificate.[2]

It argues that *Humphries* makes clear that once a FERC certificate is obtained, any

subsequent damage claim falls under federal jurisdiction.

### F.  The trial court properly dismissed appellants' complaint.

{¶ 36} The trial court held that appellants' state law claims were preempted

because Rover "abided by the terms of the FERC Certificate, FEIS, and other

documents."  It found that the UEC Plan permitted Rover to "conduct certain ground

disturbing activities outside of the right-of-way if they comply with the Plan and

Procedures," without having to negotiate an agreement with appellants or seek a variance,

---

[2] In *Humphries*, 48 F.Supp.2d 1276, 1277-83, WNG, a natural gas company, began building a natural gas pipeline on Humphries' property.  It had not attempted to negotiate an agreement with Humphries, nor had it exercised its power of eminent domain to condemn the property.  Humphries sued under state law for trespass, unlawful taking, and damage to the property adjacent to the property taken by WNG to build the pipeline.  The district court considered whether the NGA preempted some or all of Humphries' state-law claims.

The court reviewed the procedures set forth under the NGA to acquire property necessary to construct natural gas pipelines.  It explained that if WNG had followed these procedures, Humphries' state law claims for trespass and unlawful taking would have been preempted by federal law.  It found, however, that WNG did not scrupulously abide by these procedures; rather it simply entered Humphries' property and began construction, and only later did it attempt to reach an agreement with Humphries or seek court approval.  The court, therefore, held that Humphries' state-law trespass claims were not preempted as to trespasses that were committed prior to condemnation.

21.

and it observed that dewatering was among the activities permitted. The court determined that because Rover's actions were "governed by the FERC certificate and associated documentation," allowing appellants' complaint to go forward would "place state law above federal privilege." It dismissed appellants' claims "on the basis of preemption."

{¶ 37} We agree with the trial court's ultimate conclusion—that appellants' complaint must be dismissed. But our reasoning differs from that employed by the trial court. "A judgment by the trial court which is correct, but for a different reason, will be affirmed on appeal as there is no prejudice to the appellant." *State ex rel. Sommers v. Perkins Local Schools Bd. of Education*, 2017-Ohio-7991, 98 N.E.3d 1117, ¶ 5 (6th Dist.), quoting *Bonner v. Bonner*, 3d Dist. Union No. 14-05-26, 2005-Ohio-6173, ¶ 18.

{¶ 38} Federal courts have routinely recognized that "[i]t is beyond dispute that the FERC has exclusive jurisdiction over the conditions of a FERC certificate * * *." *Am. Energy Corp. v. Rockies Exp. Pipeline LLC*, S.D.Ohio No. 2:09-CV-284, 2009 WL 2148197, *3 (July 14, 2009) (citing numerous cases in support of this proposition). They also recognize that in addition to setting conditions for issuing a certificate, FERC is also charged with policing compliance with the certificates it issues. The court in *Portland Nat. Gas Transm. Sys. v. 4.83 Acres of Land*, 26 F.Supp.2d 332, 339 (D.N.H.1998) explained:

> The relevant statute and regulations place the power to police
> compliance squarely upon FERC. FERC's authority for imposing such

22.

conditions is provided in 15 U.S.C. § 717f(e): "The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."  Section 717m authorizes FERC to investigate violations of provisions of FERC's orders, *see* 15 U.S.C. § 717m(a), and FERC regulations specify procedures for such investigations, *see* 18 C.F.R. §§ 1b.1—.20.  In accordance with 18 C.F.R. § 1b.8, any person may request that FERC institute an investigation.  FERC can bring an action in district court to enforce its orders.  *See* 15 U.S.C. § 717s(a).

{¶ 39} Accordingly, "when a landowner contends that the certificate holder is not in compliance with the certificate, 'that challenge must be made to FERC, not the court.'"  *Millennium Pipeline Co. v. Certain Permanent & Temporary Easements*, 777 F.Supp.2d 475, 480-81 (W.D.N.Y.2011), quoting *Guardian Pipeline*, E.D.Wi. Nos. 08-C-0028, 08-C-54, 08-C-29, 08-C-30, 2008 WL 1751358, *16 n. 6 (Apr. 11, 2008).  *See also In re Transcontinental Gas Pipeline Co., LLC*, N.D.Ga. No. 1:16-CV-02991-ELR, 2017 WL 2622323, *2 (Mar. 30, 2017) (explaining that landowner's allegation that certificate holder was not in compliance with FERC certificate must be made to FERC); *Gas Transm. Northwest, LLC v. 15.83 Acres of Permanent Easement More or Less, located in Morrow Cty.*, 126 F.Supp.3d 1192, 1198 (D.Or.2015) (explaining that FERC is

23.

charged with evaluating a certificate holder's compliance with the terms of a certificate); *UGI Sunbury LLC v. A Permanent Easement for 0.5032 Acres*, M.D.Pa. No. 3:16-CV-00801, 2016 WL 3254991, *6 (June 14, 2016) (noting that a landowner's claim that a certificate holder is not in compliance with the certificate must be made to FERC—not the court).

{¶ 40} Appellants maintain that they have never challenged Rover's authority to take easements, Rover's right to utilize the easements in a manner consistent with the FERC certificate, or any aspect of the certificate itself. They insist that their claims are limited to tortious conduct that occurred *outside* the easement areas, therefore, their claims are not preempted.

{¶ 41} But appellants' ability to prove their claims—and Rover's ability to defend against them—revolves entirely around whether Rover complied with the conditions of the FERC certificate and related documents. For instance, to prevail on their claim for trespass, appellants must show that Rover "*without authority or privilege*, physically invade[d] or unlawfully enter[ed]" appellants' property, causing damages. (Emphasis added and citations omitted.) *Vineyard Fellowship v. Anderson*, 2015-Ohio-5083, 53 N.E.3d 910, ¶ 38 (10th Dist.). To prevail on their claim for nuisance, they must show that Rover *wrongfully* invaded appellants' legal right or interest. *Szuch v. FirstEnergy Nuclear Operating Co.,* 2016-Ohio-620, 60 N.E.3d 494, ¶ 50 (6th Dist.), quoting *Taylor v. Cincinnati*, 143 Ohio St. 426, 432, 55 N.E.2d 724 (1944). If Rover's conduct was

24.

permitted under the terms of the FERC certificate, it cannot be deemed "without authority or privilege" or "wrongful."

{¶ 42} The trial court found that Rover *did* comply with the conditions set forth in these documents. The basis for this conclusion is unclear given that Rover offered no affidavits or other Civ.R. 56(C) materials demonstrating compliance with the *specific requirements* of the FEIS, AIMP, or UEC Plan (e.g., whether it was "feasible" to dewater "to a well-vegetated upland location"; whether "dewatering activities [were] done using energy-dissipation/filtration devices"; whether Rover "monitor[ed] dewatering activities to ensure deposition of sand, silt, and/or sediment into sensitive features [was] not occurring"; whether Rover "stop[ped] dewatering activities and [made] adjustments" if deposition occurred; whether "[d]ewatering structures [were] removed as soon as practicable following dewatering activities"; etc.).

{¶ 43} It is clear that Rover's compliance or non-compliance with the FERC certificate and related documents is the central issue in this case. And because FERC is charged with evaluating a certificate holder's compliance with the terms of a certificate, FERC—not the court—must resolve this issue. Appellants may be entitled to damages if, and only if, FERC determines that Rover violated the FERC certificate and related documents by taking the actions that appellants allege in the complaint. Moreover, it would be up to FERC to determine whether and how appellants are to be "compensated" for such damages, as provided in the FERC documents.

25.

**{¶ 44}** Accordingly, we conclude that appellants' complaint was properly dismissed, and we find their first assignment of error not well-taken. In light of this conclusion, we also find no error in the trial court's denial of their cross-motion for partial summary judgment. We, therefore, find appellants' second assignment of error not well-taken.

### IV. Conclusion

**{¶ 45}** FERC is charged with setting the conditions for issuing certificates of public convenience and necessity and policing compliance with those conditions. We, therefore, find that the trial court properly dismissed appellants' state law claims because they necessarily require resolution of whether Rover complied with the conditions of the FERC certificate issued here. We, therefore, find appellants' two assignments of error not well-taken and affirm the June 5, 2019 judgment of the Wood County Court of Common Pleas. Appellants are ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

Gene A. Zmuda, P.J.
CONCURS AND WRITES
SEPARATELY.

_____
JUDGE

**ZMUDA, P.J., concurring,**

{¶ 46} I agree with the majority's conclusion that appellants' complaint was properly dismissed based upon principles of federal preemption. However, I would find that appellants' claims are preempted not because of a conflict between state and federal law, but rather, because federal law preempts the field as to the claims contained in appellants' complaint.

{¶ 47} As noted by the majority, Rover's business involves the construction of an interstate natural gas pipeline, and therefore the condemnation proceedings initiated by Rover were brought under the Natural Gas Act (NGA), 15 U.S.C. § 717, et seq. The

27.

Supreme Court of the United States, commenting on the preemptive effect of the NGA, has stated that the NGA is a "comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" *Northern Natural Gas Co. v. State Corporation Comm'n of Kansas*, 372 U.S. 84, 91, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), quoting *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 682, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). "The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), citing *Northern Natural Gas Co.* at 89. Later in its decision in *Schneidewind*, the Supreme Court indicated that it is "now well settled: Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce." *Id.* at 305.

{¶ 48} Upon its application of *Schneidewind* to a case pertaining to Michigan's authority to regulate the interstate transportation of natural gas, the Sixth Circuit Court of Appeals found that "in establishing a comprehensive regulatory network, Congress intended to occupy a field which the states could not reach." *Michigan Consol. Gas Co. v. Panhandle Eastern Pipe Line Co.*, 887 F.2d 1295, 1301 (6th Cir.1989). Additionally, in *Northern Natural Gas Co. v. Iowa Utilities Bd.*, 377 F.3d 817 (8th Cir.2004), the Eighth Circuit found that the NGA occupies the field regarding the construction and maintenance of natural gas pipelines, stating:

28.

The NGA specifically provides that the FERC will oversee the construction and maintenance of natural gas pipelines through the issuance of certificates of public convenience and necessity. See 15 U.S.C. § 717f(c). The FERC has authority to regulate the construction, extension, operation, and acquisition of natural gas facilities, *see id.* § 717f(c)(1)(A), and does so through its extensive and detailed regulations concerning applications for certificates. *See generally* 18 C.F.R. Part 157, Subpart A.

*Id.* at 821.

{¶ 49} Based upon the foregoing federal authority on the issue raised in the present case, I conclude that the state law claims raised by appellants in their complaint are within a field of regulation that is occupied by federal law under the NGA. As such, I conclude that appellants' claims are preempted, and were thus properly dismissed by the trial court. Because the majority reaches the same conclusion (albeit based upon conflict preemption rather than field preemption), I concur.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.